## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BAE Systems Information and Electronic Systems Integration Inc., | Civil Action No. |
| Plaintiff, | |
| -v- | |
| L3Harris Cincinnati Electronics Corporation f/k/a L3 Cincinnati Electronics Corporation, | |
| Defendant. | |

## COMPLAINT

BAE Systems Information and Electronic Systems Integration Inc. ("BAE Systems" or "Plaintiff"), through counsel, hereby brings this Complaint against L3Harris Cincinnati Electronics Corporation f/k/a L3 Cincinnati Electronics Corporation ("L3" or "Defendant") and alleges as follows:

## INTRODUCTION

1.     This dispute arises out of L3's breach of a Memorandum of Agreement (the "MOA"), and of an addendum ("Annex 1") and Proprietary Information Agreement ("PIA") incorporated by reference into the MOA, governing L3's and BAE Systems' joint pursuit of opportunities in the field of shipboard electro-optical/infra-red ("EO/IR") threat detection.  BAE Systems and L3 are both defense and technology companies that in recent years have made substantial investments in systems that are used by military and other customers to identify, detect, and respond to threats to waterborne vessels.

2.     BAE Systems' focus was on technology.  It invested significant sums and time into developing software and corresponding hardware configurations that leverage the capabilities of

1

EO/IR sensors, fuse multiple data sources, analyze their outputs, detect and track targets, and translate that information into actionable alerts for captains and sailors.

3.    L3's focus was on the EO/IR sensors themselves.  It invested significant sums and time advancing the capabilities of those receptors, which, in many ways, serve as the eyes and the ears of a ship.

4.    Through the MOA, BAE Systems and L3 agreed to connect L3's eyes and ears sensors with BAE Systems' processing systems, which act much like a brain that would use the sensor data to provide automated shipboard defense.  Through Annex 1, BAE Systems and L3 agreed to work together in pursuit of a specific U.S. Navy contract in the Shipboard Passive Electro-Optic/Infrared ("SPEIR") Program.  The parties agreed to collaborate on a proposal with L3 as the prime contractor and BAE Systems as a subcontractor.  They also agreed that following L3's award of the SPEIR prime contract, BAE Systems would receive a subcontract award.

5.    Consistent with its obligations under the MOA and Annex 1, BAE Systems supported and collaborated with L3 to ensure that L3 won Contract No. N00024-22-C-5514 for the Navy's SPEIR Program (the "SPEIR Contract").  In the course of that collaboration, BAE Systems shared proprietary and competitively sensitive trade secret technical data, including hardware and software configurations that BAE Systems had developed internally through years of research and development.  In finalizing L3's proposal to the government, the parties agreed on the material terms of BAE Systems' promised subcontract, including BAE Systems' scope of work and pricing structure.

6.    L3 specifically agreed that its relationship with BAE Systems for BAE Systems' scope of work under the promised subcontract was "exclusive."  Annex 1 at 2-3.  Further, L3 agreed that "[u]pon prime contract award, a subcontract ***will be awarded*** to the Supporting Party

[BAE Systems] in accordance with the scope proposed in the SOW/Role defined herein." Annex 1 at 4 (emphasis added).

7.     L3 won the lucrative SPEIR prime contract. But, instead of awarding BAE Systems the subcontract it had promised, L3 inexplicably and unilaterally changed the terms of the parties' agreement. *First*, it demanded that BAE Systems accept a different — and less advantageous — pricing structure than the Cost Plus Fixed Fee ("CPFF") model to which the parties had previously agreed. *Next*, it demanded that BAE Systems reduce its price by 33 percent without any corresponding reduction to BAE Systems' responsibilities and deliverables. *Finally*, when BAE Systems did not acquiesce to L3's unreasonable demands, L3 cut ties with BAE Systems in bad faith and is using the proprietary and trade secret information that BAE Systems provided under the terms of the PIA during the proposal process, and without which L3 would not have won the SPEIR prime contract, to perform BAE Systems' scope of work itself.

## THE PARTIES

8.     BAE Systems is a corporation registered under the laws of Delaware with its primary place of business at 65 Spit Brook Road, Nashua, NH 03060.

9.     L3 is a corporation registered under the laws of Ohio with its primary place of business at 7500 Innovation Way, Mason, OH 45040.

## JURISDICTION

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because BAE Systems asserts a claim for misappropriation of trade secrets under the federal Defend Trade Secrets Act of 2016 ("DTSA").

11.     This Court has supplemental jurisdiction over BAE Systems' remaining state law claims pursuant to 28 U.S.C. § 1367 because such claims are so related to the DTSA claim that they form part of the same case or controversy under Article III of the United States Constitution.

12.     This Court also has subject matter jurisdiction over all state law causes of action stated herein pursuant to 28 U.S.C. § 1332(a)(1).

13.     L3 is subject to personal jurisdiction under New York's long-arm statute because L3 conducts business in New York, and this claim arises from those business transactions. N.Y.C.P.L.R.§ 302(a)(1).

14.     L3 also consented to the jurisdiction of this Court in the MOA that forms the basis of this dispute.  The parties agreed that "[a]ll disputes arising out of or related to this Agreement will be subject to the exclusive jurisdiction and venue based on § 16.1 . . . and the parties hereby consent to such jurisdiction and venue."  MOA § 16.2.  The location identified in MOA § 16.1 is New York.

## VENUE

15.     Venue is proper in the Southern District of New York pursuant to the agreement of the parties.  MOA § 16.2.

## FACTUAL BACKGROUND

### A.     BAE Systems' LockNESS Program

16.     For nearly as many millennia as ships have been at sea, sailors have sought to mitigate the numerous dangers faced by seafaring vessels.  Traditionally, this has meant using lookouts or watch standers to scan for threats and alert their crewmates when they identify a potential hazard.

17.     Over time, the threats for which a lookout or watch stander must monitor have

increased in type, volume, and complexity of detection.  For instance, while the earliest sailors may have been able to focus primarily on relatively slow moving or stationary waterborne threats, such as rocks and other ships, as they appeared over the horizon, modern sailors must also stay alert for fast and erratically moving threats, including airborne threats such as unmanned aircraft and missiles, that may approach from any direction, including from above.

18.    Although the technology available to manage this increasingly complex threat environment has advanced from the use of relatively simple optical devices, such as telescopes and binoculars, to more advanced cameras and other sensors that can provide live video and other imagery to a sailor in a ship's combat information center, certain threats with small radar cross sections (such as small craft and navigation hazards) are difficult to detect with traditional sensors alone.  Thus, the process of detecting hazards remains largely the same today as when lookouts could only rely upon the naked eye: it is a manual and labor-intensive exercise.  And, because the consequences of even momentary inattention can be serious, there is no room for error.

19.    Motivated to help overcome these challenges, BAE Systems initiated an independent research and development ("IRAD") project more than a decade ago with the goal of integrating existing shipboard EO/IR sensors into an automated target detection, recognition, and classification system for the detection of other vessels and hazards in the water.  BAE Systems referred to this IRAD project as the "Lockon Naval EO/IR Sensor System" or "LockNESS."

20.    Over the next several years, BAE Systems spent millions of dollars of its own money developing LockNESS.  Along the way, BAE Systems learned numerous lessons about how to select, configure, and optimize both hardware and software for any given set of customer requirements to deliver situational awareness decision support information to system operators on a real-time basis, while reducing the demand on the system operator to detect and classify threats

manually.  These processes of converting customer requirements into specific solutions, and the hardware architectures and software algorithms that result from their application, are proprietary to BAE Systems.

21.     BAE Systems leverages the intellectual property it developed in the LockNESS project in connection with its LockNESS™ maritime defense system.  The LockNESS™ maritime defense system (i) integrates with existing shipboard sensors, (ii) fuses inputs from these sensors, (iii) analyzes the fused inputs to detect threats autonomously, and (iv) when a threat is detected, alerts an operator to take appropriate action.[1]

**B.     BAE Systems Participates in the Combined EO/IR Surveillance and Response System ("CESARS") Program**

22.     In April 2015, the Office of Naval Research announced the CESARS program.  The CESARS program was a Future Naval Capabilities effort to "provide[] comprehensive shipboard defense against optically guided anti-ship missile threats."  *Office of Naval Research, CESARS program, Solicitation No. N00173-15-R-SE04,* GOVTRIBE (Apr. 23, 2015), https://govtribe.com/opportunity/federal-contract-opportunity/combined-eoir-surveillance-and-response-system-cesars-program-n0017315rse04.

23.     The CESARS program included two aspects: Shipboard Panoramic EO/IR Cueing System ("SPECSS") and Multispectral EO/IR Countermeasures for Advanced Threats ("MEIRCAT").  *Id.*

24.     SPECSS's intended functions included "perform[ing] wide field-of-view target detection and tracking," with a primary interest in detecting "anti-ship missiles and FAC/FIAC

---

[1]*LockNESS™ maritime defense system*, BAE SYSTEMS, https://www.baesystems.com/en-us/product/lockness-maritime-defense-system#:~:text=BAE%20Systems'%20LockNESS%C2%AE%20solution,low%20radar%20cross%20section%20threats (last visited Jan. 23, 2023).

(Fast Attack Craft/Fast Inshore Attack Craft)" and a secondary interest in detecting unmanned aerial vehicles. *Id.*

25.     MEIRCAT's intended functions included "target re-acquisition, tracking, classification/identification, 3-D ranging, threat assessment, CM execution and CM effectiveness monitoring (CMEM)." *Id.*

26.     BAE Systems' experience with its LockNESS project positioned it well to participate in the CESARS program, particularly with respect to the target detection and tracking functionality in SPECSS.  Accordingly, in April 2016, the Naval Research Laboratory awarded BAE Systems Contract No. N00173-16-C-6008 for "research and development for the design, development, test and integration of SPECSS Product 2: Software, Processing Hardware, & Display" (the "CESARS/SPECSS Contract").

27.     BAE Systems leveraged the intellectual property it developed in the LockNESS project during its performance of the CESARS/SPECSS Contract and, ultimately, demonstrated the viability of its unique, proprietary solution for the detection, classification, and tracking of threats to naval vessels.

## C.     The MOA

28.     By 2020, BAE Systems had an advanced automated target detection, recognition, and classification system capable of translating inputs from EO/IR sensors into readable alerts.  L3 had state-of-the-art sensors, but not a system capable of reading and translating their inputs.  In other words, L3 developed the eyes and ears, but not the brain.  BAE Systems developed the brain. In recognition of their complimentary capabilities, BAE Systems and L3 agreed to partner, pairing their respective solutions to pursue opportunities jointly within the EO/IR shipboard defense system sphere.

29.     On May 27, 2020, the parties entered into the MOA to "combine their respective complementary technological and marketing capabilities . . . and potentially pursue collaborative efforts in the cooled and uncooled infrared imaging and signal processing technology domains . . . ." MOA Recitals.  The parties agreed "in good faith to identify and pursue collaborative efforts" to be "mutually agreed upon and documented into an Annex to [the MOA]."  MOA § 1.  Each Annex executed pursuant to the MOA is "incorporated into and made part of [the MOA]," and "outline[s] the roles and responsibility of each Party as it applies to that pursuit."  MOA § 1.

30.     The MOA is a teaming agreement as contemplated by the Federal Acquisition Regulation ("FAR").  In such an agreement, a potential prime contractor agrees to have another company act as its subcontractor under a specified Government acquisition program.  FAR 9.601. Teaming agreements are approved and encouraged by the U.S. Government.  The relevant Government regulations state that such agreements can "be desirable from both a Government and industry standpoint" because they "enable the companies involved to," among other things, (i) "[c]omplement each other's unique capabilities;" and (ii) "[o]ffer the Government the best combination of performance, cost, and delivery for the system or product being acquired."  *Id*. at 9.602.

31.     In the MOA, L3 and BAE Systems promise to "mutually agree for each Effort, whether the Parties will be exclusive to each other or if the Parties may pursue the opportunity independently or with a third party."  MOA § 3.  The MOA requires that "neither party shall use any data or information collected or received under this Agreement to further said independent or third party efforts."  MOA § 3.

32.     To protect each party's intellectual property rights, the MOA expressly incorporates a PIA executed by the Parties on or about November 12, 2018.  MOA § 5.[2]  Thus, the PIA governs the Parties' exchange of proprietary and sensitive information pursuant to the MOA, including any Annexes.

33.     The purpose of the PIA is "to provide a mechanism and capability for the exchange of Proprietary Information for the purpose of discussions related to IR Technology and potential business strategies.  ('Purpose')."  PIA § 1.

34.     The PIA defines "Proprietary Information" as "any and all business, technical and other information which is identified or labeled as 'Proprietary' or 'Confidential,' whether written, oral or otherwise furnished by one Party (the 'Disclosing Party') to the other Party (the 'Receiving Party') and shall include, but not be limited to all data, reports, interpretations, forecasts and records which Receiving Party or its respective agents or employees shall have been furnished or had access to heretofore or hereafter in the course of the Parties' discussions.  Proprietary Information shall also include information received as a result of plant tours, demonstrations or other visual or audio presentations or verbal disclosures that the Disclosing Party indicates in writing to the Receiving Party no later than thirty (30) business days after conveying such information that it is Proprietary Information."  *Id.* § 5.a.

35.     The PIA requires each Party to "(a) use any Proprietary Information disclosed to it only for the Purpose stated above; (b) not disclose the Proprietary Information to any third party; (c) not disclose the Proprietary Information to any employee who does not have a need-to-know such information; and (d) employ the same standard of care it uses to protect its own Proprietary Information, paying particular attention to avoid disclosing Proprietary Information to employees

---

[2]     The MOA references a "Proprietary Information Agreement (PIA) executed between the Parties on 12 November 2019[.]"  MOA § 5.1.  This is a typographical error; the date should read "12 November 2018."

or parties who may be or are also examining or participating in business opportunities competitive to the Purpose.  In no case shall the standard of care with respect to the Proprietary Information be less than reasonable care."  *Id.* § 6.

36.     The PIA explicitly limits each Party's rights in the other Party's Proprietary Information to the permissions granted in the PIA, explicitly stating that "[e]xcept as expressly set forth herein, no license is either granted or implied in the Proprietary Information, patents, inventions, copyrights, or trademarks of either Party."  *Id.* § 8.

37.     The Parties agree that, by virtue of the incorporation of the PIA into the MOA, the term of the PIA was extended until the termination of the MOA.  MOA § 5.1.

38.     In the MOA, the parties also expressly agree that "intellectual property shall remain the property of the Originating Party."  MOA § 9.

39.     The parties express their unequivocal "intent[] to be legally bound" in two places within the MOA.  *See* MOA Recitals; *see also* MOA § 20.1 ("Upon signing by their duly authorized representatives, this Agreement shall become a mutually binding Agreement by and between the Parties.").  They also underscore the binding nature of the MOA by agreeing upon specific bases for which it can be terminated.  *See* MOA § 12.  Specifically, L3 and BAE Systems provide that the MOA can only be terminated (i) by mutual agreement, (ii) due to a material breach that remains uncured after notice and an opportunity to cure, (iii) after one party files for bankruptcy, reorganization, or similar protection, (iv) after a party is suspended or debarred from contracting by the U.S. Government, or (v) upon the MOA's expiration.  *Id.*

40.     The MOA does not have an integration clause or specify that it constitutes the entire agreement between the parties.

D.      **The SPEIR Program**

41.     On April 17, 2020, the Department of the Navy, Naval Sea Systems Command ("NAVSEA"), on behalf of the Program Executive Office Integrated Warfare Systems Above Water Sensors Directorate, posted a pre-solicitation notice on the System for Award Management to provide information for contractors on how to request Government Furnished Information relating to the SPEIR Program. *Naval Sea Systems Command, SPEIR Bidder's Library Announcement*, GOVTRIBE (Apr. 17, 2020), https://govtribe.com/opportunity/federal-contract-opportunity/speir-bidder-s-library-announcement-n0002421r5514.

42.     The ensuing Solicitation, which was published on May 19, 2021, explained that the SPEIR Program "will leverage proven mature technology to field an integrated narrow field and wide field of view detection and cueing capability for Anti-Ship Cruise Missile (ASCM) defense, Counter- Fast Attack Craft and Fast Inshore Attack Craft (FAC/FIAC), Counter-Unmanned Aerial System (CUAS), Enhanced Mobility, and Anti-Terrorist/Force Protection (AT/FP)."  Solicitation at 23.  Through these advances, NAVSEA expected the SPEIR Program to accelerate "the fielding of advanced Electro-Optical/Infrared (EO/IR) capability to the Fleet, with an incremental approach for increasing capability as EO/IR technology continues to mature." *Id.*

43.     The Solicitation was updated on July 6 and 7, 2021. *Solicitation No. N00024-21-R-5514, SPEIR Development and Low-Rate Initial Production*, GENERAL SERVICES ADMINISTRATION (May 19, 2021, https://sam.gov/opp/b7854010bbee45b2a1d46c5fec627bf1/view.  The solicitation covered both the Engineering and Manufacturing Development ("EMD") and Low-Rate Initial Production ("LRIP") phases. *Id.*

44.     NAVSEA asked the SPEIR contractor to deliver three Engineering Development Models, to include one partial system for environmental test, one full system for Formal Qualification Test, and one full system for a Land Based Test Site.  Solicitation at 23.  It also asked the SPEIR Contractor to deliver up to 21 complete SPEIR system LRIP units and up to 21 individual Wide Field of View elements and individual Narrow Field of View elements.  *Id*.

**E.     BAE Systems and L3 Execute Annex 1 to Pursue the SPEIR Contract**

45.     BAE Systems and L3 executed Annex 1 to the MOA, dated June 15, 2020, for the purpose of "bidd[ing] and win[ning] the [U.S. Navy] Shipboard Passive EO-IR sensor program." Annex 1.  The parties agree that the pursuit "creates a competitive advantage for the L3Harris/BAE team" that "fits the strategic objectives envisioned by an L3Harris – BAE strategic relationship and the long-term L3Harris strategic plan."  *Id*.  In its cover letter transmitting the signed Annex 1, L3's Subcontracts Manager characterized the agreement as an "Annex for the [SPEIR] program pursuit, capture, ***and execution***" (emphasis added).

46.     As contemplated in the MOA, Annex 1 details each party's scope of work, as well as its role and financial obligations.  The Annex thus provides that L3 will serve as prime contractor and system integrator.  L3 agrees that its relationship with BAE Systems for BAE Systems' scope of work on the SPEIR Program is "exclusive," meaning that L3 was required to work with BAE Systems for the identified BAE Systems' scope of work.

47.     BAE Systems' scope of work is broken down into four phases: (i) EMD, (ii) LRIP, (iii) Full Rate Production ("FRP"), and (iv) Follow-on efforts, scope changes, and new business.

48.     In the EMD phase, BAE Systems is the integrated product team ("IPT") lead for the wide field of view sub-system ("WFS"), which includes several different components, all

enumerated in Annex 1. BAE Systems is also the WFS IPT lead and support manager for the EO/IR sensor manager subsystem.

49.     For the LRIP phase, the parties agree that BAE Systems is the WFS IPT lead for processor system OEM, shipboard software updates, shipboard communication/distribution updates, and classroom and ship-based training. BAE Systems agrees to serve similar roles in the FRP and Follow-on phases, and also provide WFS processor and CSCI Lifecycle support.

50.     Annex 1 concludes by affirming that "[u]pon prime contract award, a subcontract will be awarded to the Supporting Party [BAE Systems] in accordance with the scope proposed in the SOW/Role defined herein." Annex 1 at 4.

**F.      BAE Systems Supports L3's Proposal for the SPEIR Contract**

51.     To assist L3 in preparing its proposal for the SPEIR Contract, BAE Systems provided extensive technical detail about its Wide Field Sensor Interface Electronics ("WF-SIE") solution, which would handle the image processing and threat detection required as part of the SPEIR system. In response to numerous data calls from L3 spanning 2020 and 2021, BAE Systems shared this information in confidence, subject to the PIA between the parties and with the agreement that the information would only be used in furtherance of their partnership.

52.     The proprietary information that BAE Systems shared with L3 in 2020 and 2021 included both hardware architecture and software algorithm information and reflected the application of the unique capabilities that BAE Systems developed, over several years and at substantial expense through its LockNESS IRAD project and its participation in the CESARS/SPECSS program, related to converting customer requirements to specific hardware and software solutions.

13

53.     During this time, BAE Systems shared various diagrams of the computing hardware comprising the WF-SIE.  These diagrams not only identified specific components proposed for use in the WF-SIE, but also illustrated how they should be interconnected to achieve the responsiveness the Navy required of the SPEIR solution.

54.     For example, on or about June 8, 2021, BAE Systems shared a presentation, entitled "Technical Baseline Package for L3Harris" (the "Technical Baseline Presentation") detailing precisely how BAE Systems leveraged the unique knowledge it developed under LockNESS and CESARS/SPECSS to derive hardware requirements for the SPEIR program.  In particular, the Technical Baseline Presentation explained how BAE Systems translated various customer requirements, such as the types of threats to detect and track, the amount of image data being collected per unit time, the latency with which results needed to be provided to a system operator, and similar processes and information, into its proposed WF-SIE hardware architecture.  *Id*.

55.     Slides 22 and 23 of the Technical Baseline Presentation identified specific hardware BAE Systems proposed for use in the WF-SIE, including network switches, servers, central processing units, graphics processing units, random access memory, storage, and network interface adapters.  Technical Baseline Presentation at 22, 23.

56.     Slide 24 of the Technical Baseline Presentation illustrated how servers were interconnected, both internally within the WF-SIE and externally to the WFS sensor suite.  *Id.* at 24.

57.     It was not a trivial exercise for BAE Systems to arrive at the WF-SIE hardware specifications and architectures embodied in the Technical Baseline Presentation.  The WF-SIE, taken as a whole, is not a pre-existing, commercial-off-the-shelf ("COTS") system.  Indeed, BAE Systems could not have supplied L3 with a general purpose, COTS computer because a general

purpose, COTS computer would be insufficient to process the massive quantities of high-resolution data that the WF-SIE would need to handle and to otherwise meet the demands of the SPEIR program.

58.     Rather, BAE Systems applied its proprietary know-how, which it developed over many years and at great expense, to understand the Navy's requirements and to select the correct hardware components in the correct quantities and arrange them in the correct manner to meet those requirements.  This effort is captured, *inter alia*, in the Technical Baseline Presentation, and reflects a custom hardware architecture that is far more than the sum of its parts.  In other words, based on its years of investments and effort, BAE Systems designed a specific hardware configuration to meet the Navy's needs and address such factors as latency and overall system performance.  Absent reliance on BAE Systems' expertise to develop a customized hardware configuration for the WF-SIE, L3 would not have been able to prepare an offer responsive to the Navy's needs.

59.     The Technical Baseline Presentation disclosed to L3 not only what components were required to build the proposed WF-SIE (and, in many instances, the specific suppliers for those components), but also how to assemble those components.  In short, the Technical Baseline Presentation provided L3 with a turnkey solution for the WF-SIE hardware.  As a result, there was no need for L3 to learn how to build a hardware solution to satisfy the Navy's needs on the SPEIR program independently — an effort that, as described above, took BAE Systems several years and millions of dollars.  Rather, it needed only to build the system that BAE Systems specified and disclosed to L3 in confidence based on the agreement that BAE Systems would be performing the corresponding work.

60.     Similarly, in 2021, BAE Systems shared various illustrations of how the WF-SIE processed sensor data (including as part of the Technical Baseline Presentation).  These illustrations included flowcharts and block diagrams of the various image processing and hazard detection and classification algorithms that would run on the WF-SIE and how these various workflows are distributed across available WF-SIE processing capacity.  The flowcharts and block diagrams that BAE Systems shared with L3 would afford a reasonably skilled software developer writing software with a "head start" by providing an overview of what steps the software would need to perform, and in what order those steps should be performed.  BAE Systems' data sharing allowed L3 to forgo the time and money typically spent during the multiple unsuccessful rounds of research and development a company can reasonably anticipate when creating new technology. Once again, L3 needed to rely on BAE Systems' expertise to be in the position to respond to the solicitation.

61.     The information that BAE Systems shared with L3 related to the WF-SIE hardware and software is proprietary.  Further, certain aspects of the information that BAE Systems shared with L3, including the WF-SIE hardware diagrams shown in the Technical Baseline Presentation and elsewhere, constitute trade secrets.

62.     BAE Systems has taken reasonable steps to maintain the secrecy of the proprietary information it shared with L3 related to the WF-SIE hardware and software.

63.     For instance, BAE Systems shared this information with L3, including, but not limited to, the Technical Baseline Presentation, subject to the PIA.

64.     Similarly, BAE Systems marked the information it shared with L3 in accordance with the requirements of the PIA.

16

65.     As detailed above, the PIA obligates L3 to protect BAE Systems' Proprietary Information with "the same standard of care it uses to protect its own Proprietary Information" and to use BAE Systems' Proprietary Information "only for the Purpose stated above [discussions related to IR Technology and potential business strategies]."  PIA § 6.

66.     L3 leveraged the proprietary information that BAE Systems provided to draft its July 2021 proposal to the Navy.  Indeed, in many instances, L3 reproduced, verbatim, the technical information provided in confidence by BAE Systems as part of its proposal to the Navy.  This was permissible under the MOA and PIA.

67.     On the other hand, the PIA prohibits L3 from using BAE Systems' Proprietary Information for any object other than the Purpose.  PIA § 8 ("Except as expressly set forth herein, no license is either granted or implied in the Proprietary Information, patents, inventions, copyrights, or trademarks of either Party.").  Thus, absent a separate agreement (which, as described below, the Parties never consummated), L3 is not permitted to use BAE Systems' Proprietary Information to perform the SPEIR Contract independently.  Yet, it is doing precisely so.

68.     In addition to providing technical information in support of L3's proposal, BAE Systems also provided specifications, a statement of work ("SOW"), and pricing for BAE Systems' scope of work.  These parameters were discussed in detail between June 2021 and August 2022, and the agreed-upon terms were included in L3's successful proposal and shared with the Government.  During these discussions, BAE Systems' pricing for the EMD component of its work (over half the total scope of work) was consistently calculated on a Cost Plus Fixed Fee basis.  At one point during pricing discussions in July and August 2022, L3 appeared to suggest that BAE Systems' pricing for EMD would employ a Cost Plus Incentive Fee ("CPIF") basis.  But when

BAE Systems questioned L3 regarding the apparent change, L3 confirmed that EMD would be on a CPFF basis.

69.     CPFF and CPIF are two types of cost reimbursable contracts.   Under a CPFF contract, the contractor is reimbursed for its costs, plus a fixed, agreed-upon profit.   Under a CPIF contract, the contractor is also reimbursed for its costs.   Unlike in a CPFF, however, the additional fee the contractor receives is not fixed and is instead tied to certain performance targets.   The contractor can be penalized if it does not meet those targets and thus receive a lower amount than it would have otherwise received under a CPFF contract.

70.     On June 2, 2021, L3 issued a solicitation to BAE Systems requesting that BAE Systems submit its final CPFF estimate for its SOW on the SPEIR Program.

71.     BAE Systems submitted its first rough order of magnitude ("ROM") estimate incorporating its proposed SOW, specifications, and pricing information to L3 on July 2, 2021 (the "First Proposal").   BAE Systems' First Proposal included a CPFF arrangement for EMD worth $41,420,841, a Fixed Price Incentive Fee ("FPIF") arrangement for LRIP Option 4 worth $21,701,723, and a Time and Materials ("T&M") agreement for engineering services and field support.   It justified the proposed costs through its Basis of Estimate ("BOE") for the direct labor and material required to perform the services under the contract.   First Proposal at 5, 8.

72.     After discussions with L3, BAE Systems revised its First Proposal on July 8, 2021.   Although the proposed price was updated, the remainder of the pricing structure was left unchanged.   Each of BAE Systems' subsequent proposals submitted between July 2021 and August 2022 relied on the same pricing structure, to include proposing a CPFF arrangement for EMD.

73.     BAE Systems' proposed pricing structure and price of $67,574,054 was incorporated into L3's proposal of $205 million to the Government in August 2021.

**G.     The U.S. Navy Awards the SPEIR Contract to L3**

74.     On April 26, 2022, the U.S. Navy awarded the SPEIR Contract to L3, incorporating BAE Systems' scope of work and proposed pricing into the final contract.  L3's bid was for $205 million.  The SPEIR Contract was awarded for that amount.  It is worth at least $205 million and up to $593 million if all options are exercised.

75.     L3 issued a press release announcing the award of the SPEIR Contract.  The release stated that "L3Harris will serve as systems integrator and prime contractor" on a "team [that] includes Lockheed Martin and BAE Systems."  *US Navy Awards L3Harris $205 Million Contract for New Passive EO/IR Capability to protect Fleet*, L3HARRIS (June 7, 2022) https://www.l3harris.com/newsroom/press-release/2022/06/us-navy-awards-l3harris-205-million-contract-new-passive-eoir.   The release described BAE Systems' scope of work, explaining that "BAE Systems employs image processing development from CESARS that provides a fully automated image processing detection capability that reduces operator workload."  *Id.*  BAE Systems' Director of Active Protection Solutions is quoted in L3's press release, reflecting the parties' commitment to their partnership.

**H.     L3 and BAE Systems Execute Two Undefinitized Contract Actions to Begin Work on SPEIR Contract**

76.     On May 23, 2022, BAE Systems and L3 entered into an Undefinitized Contract Action (the "UCA").  A UCA is an interim agreement that can allow a subcontractor to procure materials, incur costs, and/or begin performance prior to completion of the final subcontract.  Under the UCA, BAE Systems agreed to provide L3 with "data and/or services in accordance

with" the proposal that BAE Systems' submitted in support of L3's successful proposal on the SPEIR Program.  UCA at 1.  The scope of BAE Systems' work under the UCA was "in accordance with BAE System's [sic] generated pre-contract proposal and scope for the pre-contract activity to assist with developing the Program Management Baseline (PMB)."  *Id.*  The UCA authorized BAE Systems to incur up to $250,000 in costs; it did not allow BAE Systems to perform any substantive work or earn a profit.  *Id.*

77.     As of the date that the UCA was executed, the parties expected execution of a "definitized" (*i.e.*, final) subcontract for BAE Systems on June 15, 2022.  UCA at 2.

78.     On June 15, 2022, BAE Systems and L3 executed a revised UCA (the "revised UCA").  The scope of work allowed under the revised UCA is the same as that approved in the UCA.  However, the revised UCA authorized up to $1,761,498 in work on the part of BAE Systems.  Revised UCA at 1.

**I.     DCMA Audits and Approves BAE Systems' Cost Proposal**

79.     On April 1, 2022, NAVSEA asked the Defense Contract Management Agency's Cost and Pricing Regional Command ("DCMA") to perform a pricing cost analysis of the proposal that BAE Systems submitted to L3 and that L3 accepted and incorporated into its proposal to the U.S. Government.  DCMA issued a final report on June 2, 2022 (the "DCMA Report").

80.     In the DCMA Report, DCMA described the three pricing elements that BAE Systems and L3 agreed upon in the bid submission process.  Specifically, DCMA recognized the parties' agreement to a CPFF model for EMD worth $40,870,324, an FPIF model for LRIP worth $20,830,335, and a T&M model for Engineering Services and Field Support worth $5,873,395.  DCMA Report at 2.

81.     DCMA's price analyst verified the accuracy of BAE Systems' cost model.  BAE Systems was required to provide certified cost and pricing data by the Federal Acquisition Regulations because the amount of BAE Systems' bid exceeded $2,000,000.  Following its analysis, DCMA recommended a contract price of $67,447,658, less than a one percent difference from BAE Systems' proposal of $67,574,054.  DCMA Report at 3.

**J.     L3 Demands a Price Reduction on BAE Systems' Proposed Price of $40.8 Million for EMD**

82.     On June 9, 2022, despite DCMA's validation of BAE Systems' proposal and minor recommended price reduction, L3 asked BAE Systems to reduce the price for its EMD proposal by 33 percent.  L3 included BAE Systems' original price proposal in its successful bid on or about July 19, 2021 to the Government without objection.  There is nothing to suggest there was lack of funding by the Government or that the Government asked L3 to cut costs.  While L3 insisted on significant reductions in costs, it refused to propose any decrease to BAE Systems' scope of work to offset the dramatic reduction in costs.

83.     On or about June 9, 2022, L3 changed the pricing methodology that the parties had agreed upon (and used in L3's successful bid to the Government) for BAE Systems' EMD from a CPFF pricing model with a 10% fee to a CPIF model with an 8% target fee that is variable based on performance, *i.e.*, to an incentive fee structure.  L3 did not propose or explain what metrics BAE Systems had to achieve to earn incentive fees.  June 9 Offer Letter at 2.

**K.     BAE Systems Negotiates in Good Faith**

84.     In response to L3's demand, on or about July 29, 2022, BAE Systems proposed reductions in its scope of work that would allow it to lower the overall cost by $1.3 million to $39.5 million.  BAE Systems also suggested reducing its CPFF fee from 10% to 8%.  On July 31,

2022, L3 rejected BAE Systems' proposal and declined to further extend BAE Systems' UCA, requiring BAE Systems to issue a stop work order to its departments.

85.     Following expiration of the period of performance for the authorized scope of work under the UCA, BAE Systems and L3 personnel met at L3's facility in Cincinnati in August 2022 to discuss a path forward.  At the meeting, L3 personnel instructed BAE Systems to cut its proposed labor time by approximately 60 percent.  L3 did not, however, change any requirements or offer any instructions for how BAE Systems might meet its commitment with such deflated hours.

86.     Throughout July and August 2022, BAE Systems continued to try and meet L3's demands and found ways to save an additional $2.6 million.  On or about August 18, 2022, BAE Systems thus submitted a Best and Final Offer ("BAFO") to L3 of $36.9 million for the EMD portion of the SPEIR Contract.  On or about August 24, 2022, L3 rejected BAE Systems' BAFO, terminated BAE Systems from the SPEIR Contract, and decided to perform BAE Systems' scope of work itself.

## CONCLUSION

87.     In short, BAE Systems spent years developing its hardware and software capabilities to allow EO/IR sensors to analyze imagery and issue actionable alerts for captains and sailors.  In recognition that BAE Systems possessed the technical solution for the "brain" portion of the SPEIR program and L3 only had the "eyes" and "ears" solution, L3 entered into a binding agreement with BAE Systems (MOA § 20.1) with the unequivocal "intent[] to be bound."  MOA Recitals.  Under that agreement, L3 explicitly agreed (i) to an "exclusive" relationship with BAE Systems' identified scope of work, and (ii) that, "[u]pon prime contract award, a subcontract *will*

22

*be awarded* to the Supporting Party [BAE Systems] in accordance with the scope proposed in the SOW/Role defined herein."  Annex 1 at 2-4 (emphasis added).

88.     BAE Systems collaborated closely with L3 in preparing the proposal for the SPEIR Program, sharing proprietary information under an agreement that prohibits L3 from using the proprietary information for other purposes.  L3 incorporated BAE Systems' technical description, proposed pricing structure, and price of $67,574,054 into L3's successful proposal of $205 million to the Government.  DCMA audited and verified the accuracy of BAE Systems' cost model, recommending a contract price of $67,447,658, less than a one percent difference from BAE Systems' proposal of $67,574,054.  The Government awarded the SPEIR Contract to L3 for $205 million (and up to $593 million if all options are exercised).

89.     Then, contrary to the parties' agreement, L3 radically changed the pricing model and price for BAE Systems' scope of work.  When BAE Systems refused L3's unjustified and impossible demands, L3 failed to award BAE Systems a subcontract as mandated under the MOA.

90.     It is impossible for L3 to have developed its own technical solution in just a few months, including a unique hardware and software configuration, without utilizing BAE Systems' trade secrets and proprietary data to shortcut the development process.  BAE Systems provided L3 the technical roadmap it is now using to perform the work itself.  After working for over a year with BAE Systems, receiving proprietary data and intellectual property and getting smart on the technology solution, and creating an appearance of partnering for the long-term, all while relying on BAE Systems' reputation and technical expertise, L3 then abruptly cut BAE Systems out of the SPEIR program in bad faith.

## COUNT I

### BREACH OF CONTRACT

91.     Paragraphs 1 through 90 are incorporated by reference as if fully restated herein.

92.     The parties entered into a binding contract consisting of the MOA, the PIA, and Annex 1, the latter of two explicitly incorporated by reference into the MOA (the "Agreement").

93.     Alternatively, the parties entered into a binding contract consisting of the MOA; the PIA; Annex 1; L3's submission in response to the U.S. Government's RFP for the SPEIR Program, which incorporated an agreed-upon scope of work and contract price for BAE Systems' work on the SPEIR Program; the parties' correspondence and communications relating to said submission; the ROM submissions and related correspondence and communications; all other correspondence and communications related to BAE Systems' scope of work on the SPEIR Program; and the DCMA audit (the "Alternate Agreement").

94.     In both the Agreement and the Alternate Agreement, L3 promised, among other things, to (i) award a subcontract to BAE Systems for work on the SPEIR program if L3 obtained a prime contract award from the U.S. Government, (ii) negotiate in good faith with BAE Systems on the terms of the subcontract award, and (iii) refrain from using BAE Systems' proprietary information to develop its own technical solution.

95.     BAE Systems fully performed all of its obligations under the Agreement and the Alternate Agreement in that, among other things, it (i) shared valuable proprietary data in the form of hardware and software specifications with L3 for inclusion in L3's bid to the U.S. Government, (ii) collaborated with L3 on preparation of L3's submission in response to the SPEIR RFP, (iii) provided detailed and verifiable cost proposals and work plans to support L3's submission, (iv)

performed initial work on the SPEIR Program under the UCAs; and (iv) negotiated in good faith on the terms of its proposals and the terms of a final subcontract.

96.     L3 breached the Agreement and the Alternate Agreement by, among other things, failing to award a subcontract to BAE Systems for the scope of work that the parties agreed upon in Annex 1 and in L3's bid to the U.S. Government.  L3 explicitly agreed that it has an exclusive relationship with BAE Systems for the scope of BAE Systems' work on the SPEIR Program.

97.     L3 also expressly agreed that "[u]pon prime contract award, a subcontract will be awarded to the Supporting Party [BAE Systems] in accordance with the scope proposed in the SOW/Role defined herein."  Annex 1 at 4.  The Agreement and the Alternate Agreement include no conditions, caveats, or limitations on BAE Systems' right to a subcontract award.

98.     The parties agreed upon the specific bases for which the Agreement and the Alternate Agreement can be terminated, and none was applicable here.  L3 thus had no justifiable basis to refrain from awarding BAE Systems the subcontract as promised.

99.     L3 also breached the Agreement and the Alternate Agreement by failing to negotiate with BAE Systems in good faith following L3's award of the SPEIR prime contract and retaining BAE Systems' scope of work for itself.  For example, despite the parties' agreement on the work to be performed by BAE Systems and the price to be paid therefore, L3 demanded that BAE Systems substantially lower its price without a commensurate reduction in its responsibilities.  L3 offered no justification for its demands and displayed complete inflexibility despite the fact that DCMA had verified BAE Systems' proposal and there is no indication that the Navy reduced its requirements or the funding available for the work that L3 had proposed BAE Systems would perform under the contract.  L3's breaches of its good faith obligations are further detailed below.

100.    Finally, L3 breached the parties' PIA by using proprietary and trade secret information that BAE Systems shared pursuant to its terms in support of the SPEIR proposal. Without BAE Systems' consent, on information and belief, L3 used BAE Systems' technical data to develop a competitor solution, which it could not have developed in such a short time period without the benefit of BAE Systems' technical and proprietary data. Then, having won the prime SPEIR contract with BAE Systems' support, L3 pushed BAE Systems out of the project and intends to use its competitor solution in lieu of that of BAE Systems.

## COUNT II

### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

### (PLEADED IN THE ALTERNATIVE)

101.    Paragraphs 1 through 90 are incorporated by reference as if fully restated herein.

102.    Under New York law, parties to an agreement to agree are obligated to negotiate in good faith on the open terms of the parties' final agreement. The MOA and Annex 1 require L3 to award a subcontract award to BAE Systems for its scope of work on the SPEIR program. Following the award of the SPEIR contract to L3, L3 failed to negotiate with BAE Systems in good faith on a definitized subcontract.

103.    Further, despite the parties' agreement and understanding that BAE Systems was to perform the EMD scope of work on a CPFF basis, L3 demanded that BAE Systems accept a less favorable pricing structure for such work.

104.    L3 also demanded that BAE Systems accept a 33% price reduction with no corresponding reduction to BAE Systems' responsibilities.

105.    In short, L3's unreasonable, unjustified, and bad-faith demands made it impossible for the parties to reach the agreement that was required.

## COUNT III

## UNJUST ENRICHMENT/QUANTUM MERUIT

## (PLEADED IN THE ALTERNATIVE)

106.    Paragraphs 1 through 90 are incorporated by reference as if fully restated herein.

107.    L3 contracted for, and requested, BAE Systems' assistance knowing that BAE Systems would expend substantial internal resources in support of the parties' joint objective of winning and executing the SPEIR contract.  In accordance with the parties' agreements, BAE Systems expended substantial time and resources to support L3's preparation of its successful bid for the SPEIR contract.  BAE Systems shared its proprietary technical information, as well as expertise that it developed and funded through internal research and development initiatives with L3.  BAE Systems was not compensated for its efforts.

108.    Due in significant part to BAE Systems' contributions to L3's proposal, the Navy awarded L3 a contract worth at least $205 million and potentially up to $593 million.  Following the award, L3 refused to award a subcontract to BAE Systems and elected instead to perform BAE Systems' scope of work itself.

109.    L3 has received the benefit of BAE Systems' collaboration, including the benefit of its internal research and development, and provided BAE Systems with no compensation.  L3 has thus been unjustly enriched and equity and good conscience require that L3 make restitution to BAE Systems.

## COUNT IV

## PROMISSORY ESTOPPEL

## (PLEADED IN THE ALTERNATIVE)

110.    Paragraphs 1 through 90 are incorporated by reference as if fully stated herein.

111.    L3 promised to execute a subcontract with BAE Systems to perform the work described in Annex 1 if L3 was awarded the SPEIR prime contract.

112.    BAE Systems was justified in its reliance on L3's promise to award a contract because it was stated explicitly in the parties' agreements, and the parties' course of dealing suggested that L3 intended to honor its commitment.  For example, BAE Systems was included in the preparation and review of L3's submission to the government, its final bid was incorporated into L3's proposal, L3 publicly announced its intention to award a subcontract to BAE Systems, and L3 executed UCAs with BAE Systems to start work on the project.

113.    In reliance on L3's promise, BAE Systems expended substantial time and resources assisting L3 in its attempt to obtain the SPEIR contract and preparing to perform under the terms of the required subcontract award.  BAE Systems was not compensated for these investments.

## COUNT V

## VIOLATION OF THE DEFEND TRADE SECRETS ACT

### (18 U.S.C. § 1836 *et seq.*)

114.    Paragraphs 1 through 90 are incorporated by reference as if fully restated herein.

115.    BAE Systems developed expensive and highly valuable trade secrets, which it maintains in confidence, including, but not limited to, the Technical Baseline Presentation (individually and collectively, the "Trade Secrets").

116.    BAE Systems' Trade Secrets implicate interstate commerce because they were used to compete for a federal government contract (*i.e.*, the SPEIR Contract).

117.    BAE Systems' Trade Secrets are not generally known or reasonably ascertainable.

118.    BAE Systems provided the Trade Secrets to L3 under the PIA.

119.    On information and belief, L3 is improperly using BAE Systems' Trade Secrets to perform the SPEIR Contract without BAE Systems' involvement.

120.    BAE Systems has been, and will continue to be, damaged by such misappropriation.

121.    L3 has obtained significant benefits from such misappropriation, including the ability to perform the SPEIR Contract without taking the time or incurring the costs attendant to development of a hardware and software solution that meets the requirements of the SPEIR Contract.

122.    BAE Systems is entitled to an award of damages for the actual loss and unjust enrichment caused by L3's misappropriation of BAE Systems' Trade Secrets, or an award equal to a reasonable royalty for the misappropriation.

123.    L3's misappropriation of BAE Systems' Trade Secrets was willful and malicious, and BAE Systems is therefore entitled to an award of exemplary damages and reasonable attorneys' fees.

## <u>COUNT VI</u>

## MISAPPROPRIATION OF TRADE SECRETS UNDER NEW YORK LAW

124.    Paragraphs 1 through 90 are incorporated by reference as if fully restated herein.

125.    BAE Systems developed the Trade Secrets, including, but not limited to, the Technical Baseline Presentation, and maintains them in confidence.

126.    BAE Systems' Trade Secrets are highly valuable to BAE Systems.

127.    BAE Systems' Trade Secrets are not generally known or reasonably ascertainable.

128.    BAE Systems provided the Trade Secrets to L3 under the PIA.

129.    On information and belief, L3 is using BAE Systems' Trade Secrets to perform the SPEIR Contract, without BAE Systems' involvement, in violation of the PIA.

130.     BAE Systems has been, and will continue to be, damaged by such misappropriation.

131.     L3 has obtained significant benefits from such misappropriation, including the ability to perform the SPEIR Contract without taking the time or incurring the costs attendant to development of a hardware and software solution that meets the requirements of the SPEIR Contract.

132.     BAE Systems is entitled to an award of damages for its actual losses caused by L3's misappropriation of BAE Systems' Trade Secrets.

<u>COUNT VII</u>

**UNFAIR COMPETITION UNDER NEW YORK LAW**

133.     Paragraphs 1 through 90 are incorporated by reference as if fully restated herein.

134.     BAE Systems developed the Trade Secrets, including, but not limited to, the Technical Baseline Presentation, and maintains them in confidence.

135.     BAE Systems also possesses proprietary information in addition to the Trade Secrets (collectively, the "Proprietary Information").

136.     BAE Systems' Trade Secrets and Proprietary Information offer BAE Systems a commercial advantage because, absent access to and use of the Trade Secrets and Proprietary Information, any competitor seeking to provide a hardware and software solution that meets the requirements of the SPEIR Contract would need to spend considerable time and invest considerable money to develop such a solution.

137.     BAE Systems disclosed the Trade Secrets and Proprietary Information to L3 subject to the PIA.

138.   On information and belief, L3 misappropriated BAE Systems' commercial advantage by exploiting BAE Systems' Trade Secrets and Proprietary Information to perform the SPEIR Contract, without BAE Systems' involvement.

139.   L3's exploitation of BAE Systems' Trade Secrets and Proprietary Information for its own account, in violation of the PIA, constitutes bad faith.

140.   BAE Systems has been, and will continue to be, damaged by L3's unfair competition.

141.   BAE Systems is entitled to an award of damages for its actual losses caused by L3's unfair competition.

## PRAYER FOR RELIEF

142.   Wherefore, Plaintiffs pray that this Court enter judgment as follows, ordering that:

    a.   BAE Systems is entitled to judgment in its favor on all counts alleged in this Complaint;

    b.   L3 is required to award BAE Systems a subcontract for the SPEIR Program;

    c.   L3 is enjoined from further use of BAE Systems' proprietary and trade secret information;

    d.   BAE Systems is awarded actual damages, including lost profits and restitution of L3's ill-gotten gains in an amount to be proven at trial;

    e.   BAE Systems is awarded exemplary damages;

    f.   BAE Systems is awarded pre- and post-judgment interest, costs, and attorney fees to the maximum extent allowable by law or contract; and,

    g.   BAE Systems is awarded all further relief to which BAE Systems may be entitled.

March 3, 2023                          By:   s/ Rebecca J. Fiebig

                                      Rebecca J. Fiebig (Bar No. RP1982)
                                      Gregory M. Williams
                                      Scott Felder
                                      Lisa M. Rechden
                                      WILEY REIN LLP
                                      2050 M Street NW
                                      Washington, DC 20036
                                      rfiebig@wiley.law
                                      gwilliams@wiley.law
                                      sfelder@wiley.law
                                      lrechden@wiley.law
                                      Phone: (202) 719-7000
                                      Facsimile: (202) 719-7049

                                      *Counsel for Plaintiff*