UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                        :

BAE SYSTEMS INFORMATION AND      :
ELECTRONIC SYSTEMS INTEGRATION INC.,  :

                              :                    23-cv-01860 (PAC)

                *Plaintiff*,       :

                              :

        *-against-*           :          **OPINION & ORDER**

                              :

L3HARRIS CINCINNATI ELECTRONICS    :
CORPORATION F/K/A/ L3 CINCINNATI    :
ELECTRONICS CORPORATION,          :

                              :

             *Defendant.*    :
------------------------------------------------------------------x

       Plaintiff BAE Systems Information and Electronic Systems Integration Inc. ("BAE") sues Defendant L3 Harris Cincinnati Electronics Corporation ("L3") for breach of contract, quasi-contract, federal and state misappropriation of trade secret, and unfair competition claims. BAE's claims stem from L3's alleged failure to award BAE a subcontract under L3's prime contract with the United States Navy for the development of an electro-optic/infrared ("EO/IR") naval defense system. L3 moves to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court **DENIES** L3's motion to dismiss the breach of contract (Count I), quasi-contract (Counts III and IV), and Defend Trade Secrets Act (Count V) claims. The Court **GRANTS** L3's motion to dismiss the claim for violating the covenant of good faith and fair dealing (Count II) and the claims under New York law for misappropriation of trade secrets (Count VI) and unfair competition (Count VII).

1

## BACKGROUND

The following is drawn from the Complaint and documents integral to the Complaint. The Court construes the factual allegations as true and views the Complaint in the light most favorable to BAE. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### I.    The Teaming Agreement

Plaintiff BAE and Defendant L3 are "defense and technology companies that in recent years have made substantial investments in systems that are used by military and other customers to identify, detect, and respond to threats to waterborne vessels." Compl. ¶ 1, ECF No. 1. BAE began an independent research and development "project more than a decade ago" that led it to develop a "unique, proprietary solution for the detection, classification, and tracking of threats to naval vessels." *Id.* ¶¶ 19, 27. L3, on the other hand, has created "state-of-the-art" EO/IR sensors to detect threats, "but not a system capable of reading and translating their inputs." *Id.* ¶ 28. In other words, BAE and L3 developed complimentary systems: "L3 developed the eyes and ears" and BAE developed "the brain." *Id.*

On May 27, 2020, BAE and L3 entered into a "teaming agreement"[1] documented in a "Memorandum of Agreement" ("MOA") to "combine their respective complementary technological and marketing capabilities . . . and potentially pursue collaborative efforts . . . for end use" by government agencies. *Id.* ¶¶ 29–30; Conley Decl. Ex. 2 ("MOA"), ECF No. 26-2.[2] The MOA did not specify efforts they would pursue. Rather, the parties agreed that each effort "identified for pursuit hereunder shall be mutually agreed upon and documented into an Annex to

---

[1] In a teaming agreement, "a potential prime contractor agrees to have another company act as its subcontractor under a specified Government acquisition program." Compl. ¶ 30. These types of agreements are "approved and encouraged by the U.S. Government." *Id.*

[2] A redacted version of the MOA is available at ECF No. 25-2.

this Agreement. Each Annex will outline the roles and responsibility of each Party as it applies to that pursuit" and "will be incorporated into and made part of this Agreement." MOA § 1.

The MOA contemplated that the parties would have to share proprietary information to mutually pursue business opportunities. The parties agreed "to protect the proprietary data . . . in accordance with the terms and conditions of the Proprietary Information Agreement (PIA) executed between the Parties . . . and incorporated herein." *Id.* § 5.1. The PIA had previously been executed on November 12, 2018 "to provide a mechanism and capability for the exchange of Proprietary Information for the purpose of discussions related to IR Technology and potential business strategies." Conley Decl. Ex. 4 ("PIA") § 1, ECF No. 26-4.[3] These two documents govern the parties' relationship in jointly pursuing business opportunities specifically identified in any Annexes. *See* Compl. ¶¶ 31–32.

## II.    Parties' Preparation and Negotiations Leading to the SPEIR Contract Bid

On April 17, 2020, the Department of the Navy posted a pre-solicitation notice with information about bidding on the Shipboard Passive Electro-Optic/Infrared ("SPEIR") Program. *Id.* ¶¶ 4, 41. The purpose of the Program was "to accelerate 'the fielding of advanced Electro-Optical/Infrared (EO/IR) capability to the Fleet, with an incremental approach for increasing capability as EO/IR technology continues to mature.'" *Id.* ¶ 42 (quoting Solicitation).

On June 15, 2020, the parties executed Annex 1 to the MOA with the "[o]bjective" of "bid[ding] and win[ning]" the SPEIR Program. *Id.* ¶ 45; Conley Decl. Ex. 1 ("Annex 1") at 1, ECF No. 26-1.[4] The parties agreed that L3 would be the "Prime Contractor" while BAE would be the "Subcontractor" and "Supporting Party." Annex 1 at 2. Consistent with the MOA's

---

[3] A redacted version of the PIA is available at ECF No. 25-4.

[4] A redacted version of Annex 1 is available at ECF No. 25-1.

requirement that the parties "will mutually agree" whether an opportunity pursued in an Annex "will be exclusive to each other or if the Parties may pursue the opportunity independently or with a third party," MOA § 3, Annex 1 stated that the SPEIR bid would be "Exclusive for the scope described in [the] Supporting Party Section," Annex 1 at 2. The Annex also included detailed information about BAE's "SOW/Role" broken out into four distinct phases. *Id.* at 2–3. Annex 1 concludes that "[u]pon prime contract award, a subcontract will be awarded to the Supporting Party in accordance with the scope proposed in the SOW/Role defined herein." *Id.* at 4. Notably, when L3's Subcontracts Manager transmitted the signed Annex 1 to BAE, in the cover letter, the Manager characterized the Annex as an agreement for the "pursuit, capture, *and execution*" of the SPEIR Program. Compl. ¶ 45.

In pursuit of the SPEIR Contract, BAE assisted L3 with its prime contract bid. BAE had to rely on its "expertise to develop a customized hardware configuration" for L3's bid because L3 "would not have [otherwise] been able to prepare an offer responsive to the Navy's needs." *Id.* ¶ 58. To create a custom proposal, BAE shared extensive proprietary information and trade secrets through presentations and "numerous data calls" between 2020 and 2021. *Id.* ¶¶ 51–53. The information BAE shared reflected "several years [of research and development] and millions of dollars." *Id.* ¶ 59. L3 "leveraged" the information BAE shared to draft its bid submitted to the Navy, including reproducing "verbatim" some of the technical information. *Id.* ¶ 66.

"In addition to providing technical information" that L3 incorporated into the bid, BAE "provided specifications, a statement of work," and a pricing structure for BAE's scope of work. *Id.* ¶¶ 51, 66, 68. More specifically, the parties discussed the "pricing structure" for BAE's scope of work between June 2021 and August 2022. *Id.* ¶ 68. BAE provided several estimates for its proposed statement of work ("SOW"), each relying on the same pricing structure. *Id.* ¶¶ 71–72.

BAE's final "proposed pricing structure and price of $67,574,054 was incorporated into L3's proposal of $205 million to the Government in August 2021." *Id.* ¶ 73.

While L3's SPEIR bid was under consideration, on April 1, 2022, the Navy asked the Defense Contract Management Agency's Cost and Pricing Regional Command ("DCMA") to perform a pricing cost analysis of BAE's proposal that was incorporated into the bid. *Id.* ¶ 79. The DCMA's final report "verified the accuracy" of the "certified cost and pricing data" BAE provided and recommended a contract price of $67,447,658—what amounted to less than a "one percent difference" from BAE's proposed price. *Id.* ¶¶ 79, 81. The report also recognized that the parties agreed to certain pricing models for each phase of BAE's SOW. *Id.* ¶ 80.

## III.    L3 Receives the Prime Contract

"On April 26, 2022, the U.S. Navy awarded the SPEIR Contract to L3, incorporating BAE Systems' scope of work and proposed pricing into the final contract." *Id.* ¶ 74. The Contract was awarded for $205 million (the amount that L3 bid) with the potential to be worth up to $593 million "if all options are exercised." *Id.* L3 issued a press release announcing the award and noting that L3 "will serve" as the "prime contractor" on a "team [that] includes Lockheed Martin and BAE Systems." *Id.* ¶ 75 (alteration in original).

## IV.    Post-Award Fallout

About one month after the Navy awarded L3 the SPEIR Contract, on May 23, 2022, BAE and L3 entered into an "Undefinitized Contract Action" ("UCA") to allow BAE "to procure materials" and incur costs up to $250,000 "prior to completion of the final subcontract." *Id.* ¶ 76. The UCA stated that the parties expected execution of a "definitized" subcontract by June 15, 2022; but on that date, the parties extended the UCA and authorized up to $1,761,498 in work. *Id.* ¶¶ 77–78.

Shortly after executing the first UCA, L3 sought to change BAE's price amount and structure. Without any justification, L3 asked BAE for a 33% price reduction for the phase of the project that accounted for over half the total scope of work. *Id.* ¶ 82. L3 did not suggest any decrease in BAE's SOW to offset that "dramatic reduction" in work. *Id.* L3 also asked for a new pricing structure that disadvantaged BAE. L3 wanted BAE to accept an incentive fee model instead of the fixed fee model incorporated into its bid. *Id.* ¶¶ 68–69, 83. The incentive fee model required BAE to hit certain performance targets to earn a profit, but "L3 did not propose or explain what metrics BAE Systems had to achieve to earn incentive fees." *Id.* ¶ 83.

BAE attempted to negotiate and lower its costs. In July 2022, BAE proposed reductions in its intended scope of work to lower its overall cost by $1.3 million. *Id.* ¶ 84. L3 rejected BAE's proposal. *Id.* L3 also declined to further extend the UCA, forcing BAE to "issue a stop work order to its departments." *Id.* At a meeting in August 2022, L3 "instructed" BAE "to cut its proposed labor time by approximately 60 percent" without any suggestions for how BAE could still meet its commitment under the SOW. *Id.* ¶ 85. BAE continued to try to reduce costs, proposing a "Best and Final Offer" with a proposal that allowed it to save an additional $2.6 million. *Id.* ¶ 86. L3 rejected that offer on August 24, 2022 and "decided to perform BAE Systems' scope of work itself." *Id.*

On March 3, 2023, BAE brought claims against L3 for breach of contract (Count I), and in the alternative, breach of the duty of good faith and fair dealing (Count II), unjust enrichment/*quantum meruit* (Count III), and promissory estoppel (Count IV). *Id.* ¶¶ 91–113. BAE also brought claims pursuant to the Defend Trade Secrets Act ("DTSA") (Count V), 18 U.S.C. § 1836, *et seq.*, and New York state law for misappropriation of trade secrets (Count VI) and unfair competition (Count VII). *Id.* ¶¶ 114–41.

On April 20, 2023, L3 moved to dismiss all claims. Def.'s Mot. Dismiss, ECF No. 23. On

May 19, 2023, L3 moved to stay discovery pending the Court's resolution of its motion to dismiss.

Mot. Stay Disc., ECF No. 32. On June 26, 2023, the Court granted L3's motion to stay discovery

because the nature of BAE's claims raise the possibility that a significant portion of discovery will

include sensitive information of the parties and the U.S. Government, so even a slight narrowing

of the claims could materially lessen the burden of discovery. Order at 2, ECF No. 38. In addition,

a short stay pending the resolution of the motion to dismiss would not unfairly prejudice BAE. *Id.*

## DISCUSSION

### I.    Rule 12(b)(6) Standard

To defeat a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil

Procedure 12(b)(6), a complaint must allege sufficient facts to state a plausible claim for relief.

*Iqbal*, 556 U.S. at 678. A claim is facially plausible "when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* While the court must accept all well-pleaded factual allegations as true and draw all

reasonable inferences in the plaintiff's favor, the court is "not bound to accept as true a legal

conclusion couched as a factual allegation." *Id.* Thus, a pleading that offers only "labels and

conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007). For now, the task "is merely to assess the legal

feasibility of the complaint, not to assay the weight of the evidence which might be offered in

support thereof." *Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011).

In considering a Rule 12(b)(6) motion to dismiss, the court is "normally required to look

only to the allegations on the face of the complaint." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir.

2007). However, in addition to the complaint, the court may consider "documents that 'are

attached to the complaint,' 'incorporated in it by reference,' 'integral' to the complaint, or the proper subject of judicial notice." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quoting *Roth*, 489 F.3d at 509). "Where the complaint 'relies heavily upon [a document's] terms and effect,'" such as a contract, it is considered "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)). When a contract is considered on a motion to dismiss, the court is "not constrained to accept the allegations of the complaint in respect of the construction of the [contract]," but "any contractual ambiguities" should be resolved in the plaintiff's favor. *See Int'l Audiotext Network*, 62 F.3d at 72. In this case, the Court considers the MOA, PIA, and Annex 1 in addition to the Complaint because those documents are integral to the Complaint.

## II.    Breach of Contract & Related Claims

BAE alleges that L3 breached a "binding contract consisting of" either (1) the MOA, PIA, and Annex 1 (together, the "Agreement") or (2) the Agreement along with L3's submission to the Navy for the SPEIR Contract, which incorporated BAE's "agreed-upon scope of work and contract price," the parties' "correspondence and communications relating to said submission," BAE's SOWs and price structure provided to L3 with related correspondence, all other communication related to BAE's scope of work, and the DCMA audit (the "Alternate Agreement"). *Id.* ¶¶ 92–93. BAE alleges three theories of breach: that L3 failed to "(i) award a subcontract to BAE Systems," "(ii) negotiate in good faith with BAE Systems on the terms of the subcontract award, and (iii) refrain from using BAE Systems' proprietary information to develop its own technical solution." *Id.* ¶ 94. BAE also alleges, in the alternative, quasi-contract claims and a claim for breach of the duty of good faith and fair dealing.

L3 has moved to dismiss these claims. First, L3 argues that the Agreement was merely an

agreement to agree and not a binding obligation.  Second, L3 asserts that BAE has failed to allege facts to support a claim for breach of the duty to negotiate in good faith and that its independent claim for breach of the covenant of good faith and fair dealing should be dismissed as duplicative. Third, L3 argues that the PIA's obligations regarding the parties' proprietary information was superseded by a Non-Disclosure Agreement executed specifically for the SPEIR Contract.  Fourth, L3 moves to dismiss the quasi-contract claims as duplicative.  Finally, L3 argues that any surviving claims are foreclosed by the MOA's limitation of liability clause.  The Court begins with whether BAE has alleged there was a binding agreement to award BAE the subcontract.

### A. Breach of a Binding Preliminary Agreement

When parties to a commercial transaction enter into a preliminary agreement but fail to execute a more formal agreement, "the issue arises as to whether the preliminary agreement is a binding contract or an unenforceable agreement to agree." *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 547 (2d Cir. 1998).  New York law recognizes two types of preliminary agreements that create binding obligations.[5]  "The first is a fully binding preliminary agreement, which is created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document." *Id.* at 548. That form of preliminary agreement is referred to as a Type I agreement; it "binds both sides to their ultimate contractual objective" despite their failure to formally draft and execute a final agreement. *Id.*; *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996).  A Type II agreement, "is created when the parties agree on certain major terms, but leave other terms open for further negotiation." *Adjustrite*, 145 F.3d at 548; *Shann*, 84 F.3d at 77.  While the parties are not bound to the terms of

---

[5] The MOA contains a New York choice of law provision, MOA § 16, and the parties agree that New York law applies.

a Type II agreement, they are obligated "to negotiate the open issues in good faith in an attempt to reach the objective within the agreed framework." *Adjustrite*, 145 F.3d at 548 (alteration omitted). A "mere proposal" where "neither party has an obligation to negotiate further" is different from a Type I or Type II agreement. *Id.*

BAE argues that it has plausibly alleged a Type I agreement. "The key, of course, is the intent of the parties: whether the parties intended to be bound, and if so, to what extent." *Id.* at 548–49. The Court must "discern that intent" of the parties to be bound to an ultimate agreement by looking to "the words and deeds of the parties which constitute objective signs in a given set of circumstances." *Id.* at 549 (brackets omitted). The following four factors are relevant: "(1) whether there is an expressed reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005). These factors do not provide a "talismanic scorecard" as the "ultimate issue" is always the parties' intent to be bound. *Vacold LLC v. Cerami*, 545 F.3d 114, 125 (2d Cir. 2008).

### i. *Expressed Reservation & Language in the Agreement*

The terms used in the Agreement reflect an intent to bind L3 to the ultimate contractual objective of awarding BAE the subcontract. Nothing in the Agreement "expressly states that the parties will not be bound in the absence of a further, definitive written instrument." *Id.* Rather, several provisions reflect the parties' intention to be bound by the terms stated therein. *E.g.*, MOA, Recitals ("in consideration of the premises, as well as the mutual obligations herein made and undertaken, the Parties, intending to be legally bound, hereby agree as follows"); *id.* § 20.1 ("Upon signing by their duly authorized representatives, this Agreement shall become a mutually binding

Agreement by and between the Parties."); *id.* § 12.1 (listing ways to terminate the agreement). Annex 1, which specifically covers the SPEIR Program, unequivocally states that "[u]pon prime contract award, a subcontract *will be* awarded to the Supporting Party in accordance with the scope proposed in the SOW/Role defined herein." Annex 1 at 4 (emphasis added); *see also id.* at 1 (characterizing the SPEIR bid as the joint "opportunity" for "the L3Harris/BAE team"). The agreement in Annex 1 was not contingent on negotiations or reaching any further agreements. It was contingent only on the Navy awarding L3 the prime contract. *See, e.g., Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 96 (2d Cir. 2007) (distinguishing between conditioning "the enforceability of an agreement on the occurrence of one or more stipulated events" in a Type I agreement from requiring the "successful completion of . . . negotiations," which signals a Type II agreement). BAE sufficiently alleged facts supporting this factor, which is the "most important" to determining whether the agreement is a fully binding one. *See Adjustrite*, 145 F.3d at 549.

### ii. *Partial Performance & Parties' Conduct*

In addition to the terms of the agreement, the parties' conduct may further establish the existence of a contract. *See Tractebel*, 487 F.3d at 97. "In determining whether the parties' conduct is consistent with the existence of a binding contract, it is necessary that the totality of all acts of the parties, their relationship and their objectives be considered." *Id.* Here, shortly after the Navy awarded L3 the prime contract, L3 issued a press release that indicated its intent to award BAE the subcontract. Compl. ¶¶ 74–75. In addition, one of L3's managers working on the SPEIR Program understood the Annex to cover the parties' future "execution" of the SPEIR Program. *See id.* ¶ 45. BAE also alleges that it took "significant steps in reliance" on the Agreement while a formal contract was being finalized. *See FCOF UB Sec. LLC v. MorEquity, Inc.*, 663 F. Supp.

11

2d 224, 230 (S.D.N.Y. 2009). The parties entered into the UCA to allow BAE to begin work on the subcontract based on its intended SOW. Compl. ¶ 76. The parties even extended the UCA and authorized up to $1,761,498 in work. *Id.* ¶ 78. BAE's partial performance, particularly performance within the confines of the SOW that L3 incorporated into its bid, also supports that the parties reached an agreement as to the ultimate contractual objective.

### iii. Existence of Open Material Terms

"The existence of open terms 'is always a factor tending against the conclusion that the parties have reached a binding agreement.'" *Vacold*, 545 F.3d at 128 (quoting *Tchrs. Ins. & Annuity Ass'n of Am. v. Trib. Co.*, 670 F. Supp. 491, 499 (S.D.N.Y. 1987)). But "not all terms of a contract need be fixed with absolute certainty.'" *Tractebel*, 487 F.3d at 95. "A contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement." *Id.* (brackets omitted). The "parties' intent is ultimately controlling: if the parties intended to be bound despite the presence of open terms, 'courts should not frustrate their achieving that objective or disappoint legitimately bargained contract expectations.'" *Vacold*, 545 F.3d at 128 (quoting *Tribune*, 670 F. Supp. at 499).

L3 argues that the "Agreement is devoid of the material terms," such as "the specific cont[r]act type, the price, the manner of payment, or time of performance." Def.'s Mem. Law Supp. Mot. Dismiss ("Def.'s MTD") 5, ECF No. 24. The Court disagrees. To the extent any terms are missing from the Agreement, BAE has plausibly alleged that any omitted or indefinite terms could be rendered certain with extrinsic evidence gathered during discovery.[6] *See Vacold*, 545

---

[6] To the extent that there are open terms that would preclude enforcing a Type I agreement, those open terms do not foreclose the existence of a Type II agreement. *See, e.g., Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 127 (S.D.N.Y. 2010). The existence of open terms "may actually support finding a binding Type II agreement." *See Brown*, 420 F.3d at 158. Therefore, "even if necessary terms to a binding agreement remain unresolved, [BAE] has

F.3d at 127 (considering the parties' "drafting history" because it is appropriate to consider the parties' "correspondence," "other preliminary or partially complete writings," and the "totality of the circumstances," instead of placing a "disproportionate emphasis . . . on any single act, phrase or other expression"). Here, because of the unique course of dealing between the parties—that BAE's SOW was customized to fit the Navy's request and L3's needs to execute this project, Compl. ¶¶ 28, 58, 66, 73, 88, and that L3 was not permitted to execute BAE's portion of the work with a different subcontractor or without BAE, *id.* ¶¶ 46, 96—BAE's allegations support the inference that L3's bid to the Navy can supply any missing terms because the bid also reflected agreed-upon terms between the parties. *See Clifford R. Gray, Inc. v. LeChase Const. Servs., LLC*, 819 N.Y.S.2d 182, 185 (N.Y. App. Div. 3d Dep't 2006) (leaving open that "bid proposals" could be "utilized to determine pricing as a matter of commercial practice"). Further, the DCMA's ability to perform a pricing analysis and conclude that the parties reached an agreement on material financial terms, Compl. ¶¶ 79–80, demonstrates that L3's bid may supply discernable and definite terms to which the parties agreed.

### iv. Contract Form & Type

This last factor probes whether "in the relevant business community, it is customary to accord binding force to the type of informal or preliminary agreement at issue." *Tribune*, 670 F. Supp. at 503. BAE argues that "in the government contractor community," a preliminary agreement is given binding force. Pl.'s Mem. Law Opp'n Mot. Dismiss ("Pl.'s Opp'n") 7–8, ECF No. 31; Compl. ¶ 30 (citing government regulations that encourage teaming agreements like the MOA). In general, "[t]he fact that the parties never finalized an implementing subcontract is

---

sufficiently alleged [a Type II agreement and] that the parties intended to be bound to negotiate in good faith toward an ultimate contractual goal." *MorEquity, Inc.*, 663 F. Supp. 2d at 230.

usually not fatal to enforcing the teaming agreement on its own—if the parties intended the teaming agreement itself to constitute a binding agreement that enumerated definite terms of behavior governing the parties during, or even after, the bidding process." *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 667 (3d Cir. 1998) (collecting cases).

* * *

In sum, BAE has sufficiently alleged the necessary components of a Type I agreement. BAE's breach of contract claim for L3's failure to award BAE the subcontract therefore survives L3's motion to dismiss.

### B.  Breach of the Duty of Good Faith and Fair Dealing

"Under New York law, a covenant of good faith and fair dealing is implicit in all contracts during the course of contract performance." *Tractebel*, 487 F.3d at 98.  "[W]hether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case." *Id.*  Because "the question of whether a party acted in good faith" is fact intensive, it "typically is not suitable for resolution on a motion to dismiss." *Gas Nat., Inc. v. Iberdrola, S.A.*, 33 F. Supp. 3d 373, 383 (S.D.N.Y. 2014).  Thus, at this stage, the plaintiff must "plausibly allege specific conduct from which a reasonable jury or fact finder could conclude that [the defendant] breached its obligation to negotiate in good faith." *EIG Credit Mgmt. Co., LLC v. CNX Res. Corp.*, No. 20-cv-2887, 2021 WL 1226415, at *7 (S.D.N.Y. Mar. 31, 2021).

#### i.  Breach of Contract

As part of the breach of contract claim, the Complaint alleges that L3 failed to negotiate with BAE in good faith on the terms of the subcontract following L3's award of the SPEIR Contract.  Compl. ¶ 99.  In context of a preliminary agreement, the duty of good faith and fair dealing "bars a party from 'renouncing the deal, abandoning the negotiations, or insisting on

conditions that do not conform to the preliminary agreement.'" *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011) (quoting *Tribune*, 670 F. Supp. at 498).

Accepting the allegations as true, the Complaint supports the inference that L3 demanded terms inconsistent with the preliminary agreement. Different from BAE's scope of work submitted with L3's bid, L3 demanded that BAE cut labor costs by 60% and accept a 33% price reduction with a less favorable pricing structure on the most significant phase of BAE's work. Compl. ¶¶ 82–83, 85, 103–04. L3 made those demands without justification or suggestions for adapting BAE's scope of work to offset the cost reductions. *Id.* ¶¶ 82, 85. Insisting on changes to core terms in the parties' preliminary agreement can constitute a breach of the duty to negotiate in good faith. *See, e.g.*, *EIG Credit Mgmt. Co.*, 2021 WL 1226415, at *7 (sufficiently stating a claim for breach of the duty to negotiate in good faith where the party "insist[ed] on major changes to certain core aspects of the" preliminary agreement); *Network Enterprises, Inc. v. APBA Offshore Prods., Inc.*, 427 F. Supp. 2d 463, 485–86 (S.D.N.Y. 2006) (holding that the duty to negotiate in good faith was violated where a party attempted "to obtain an entirely new contract . . . on terms more favorable to" it), *aff'd*, 264 F. App'x 36 (2d Cir. 2008). Moreover, the less favorable pricing structure required BAE to hit certain performance targets to earn a profit. But L3 obfuscated how BAE could earn a fee, *id.* ¶ 83, further demonstrating L3's purported "deliberate misconduct" and bad faith, *see L-7 Designs, Inc. v. Old Navy, LLC*, 964 F. Supp. 2d 299, 308 (S.D.N.Y. 2013). For these reasons, BAE has plausibly alleged specific conduct from which a reasonable fact finder could conclude that L3 failed to negotiate in good faith.

### ii. Alternative Claim

The Complaint asserts a separate claim for breach of the covenant of good faith and fair dealing (Count II). However, New York law "does not recognize a separate cause of action for

15

breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). "Under New York law, claims are duplicative when both 'arise from the same facts and seek the identical damages for each alleged breach.'" *Deutsche Bank Nat. Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015) (quoting *Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 894 N.Y.S.2d 47, 50 (N.Y. App. Div. 1st Dep't 2010)). This claim is based on the same facts as the claim that L3 breached the preliminary agreement by failing to negotiate in good faith. *See* Compl. ¶¶ 99, 101–05; *see also Bear Stearns Inv. Prod., Inc. v. Hitachi Auto. Prod. (USA), Inc.*, 401 B.R. 598, 628 (S.D.N.Y. 2009) (concluding the independent claim for breach of good faith and fair dealing was duplicative of the claim for breach of a Type II agreement). Count II therefore must be dismissed.

### C. Breach of the PIA

In addition to BAE's claims that L3 breached its obligation to award BAE the subcontract and failed to negotiate in good faith, the Complaint alleges that L3's use of BAE's "proprietary information to develop its own technical solution" breached the PIA, which was incorporated into the MOA. *See* Compl. ¶ 94. L3 moves to dismiss this claim. It argues that the PIA has been superseded by a Non-Disclosure Agreement ("NDA") executed specifically for the SPEIR Contract, extinguishing any claim under the PIA. Def.'s MTD 11.

As a threshold matter, BAE asserts the Court cannot consider the terms of the NDA because it is not mentioned in the Complaint and BAE did not rely on it in drafting the Complaint. Pl.'s Opp'n 10. However, if the NDA supersedes the PIA, it is integral to the Complaint and appropriate to consider on a motion to dismiss. *See, e.g., DeSouza v. Andy Frain Servs., Inc.*, No. 12-cv-1308, 2012 WL 3245496, at *2 (S.D.N.Y. Aug. 6, 2012) (considering a document that "undisputedly"

superseded the parties' agreement as integral to the complaint). And if the PIA is superseded, then BAE cannot sustain a claim for breach of that agreement. *See Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*, 474 N.Y.S.2d 122, 125 (N.Y. App. Div. 2d Dep't 1984), *aff'd*, 477 N.E.2d 1102 (N.Y. 1985). "Under New York law, a subsequent contract regarding the same subject matter supersedes the prior contract." *Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1195 (S.D.N.Y. 1996). The "later contract" must "deal with precisely the same subject matter as the earlier contract" to supersede the earlier one. *Globe Food Servs. Corp. v. Consol. Edison Co. of New York*, 584 N.Y.S.2d 820, 821 (N.Y. App. Div. 1st Dep't 1992). The subsequent agreement will supersede "only those terms of the earlier contract" of precisely the same subject matter, rather than the "entire contract." *CreditSights, Inc. v. Ciasullo*, No. 05-cv-9345, 2007 WL 943352, at *6 (S.D.N.Y. Mar. 29, 2007).

The relevant agreements here are those governing the parties' disclosure and use of proprietary information. The earlier agreement, the PIA, was executed on November 12, 2018, and broadly covers "discussions related to IR Technology and potential business strategies." PIA § 1. By contrast, the NDA was executed on February 14, 2022 to "further[] a mutual business relationship between the Parties relating to the Shipboard Passive Electro-Optical/Infrared (SPEIR) Sensing proposal and/or contract." Conley Decl. Ex. 3 ("NDA") § 4, ECF No. 26-3.[7] L3 argues that Section 13 ("Relationship to Related Contracts") of the PIA contemplates that the NDA would supersede it. Section 13 states: "If the Parties hereinafter enter into a contract that requires or permits use or disclosure of Proprietary Information disclosed pursuant to this Agreement, the terms of such later contract requiring or permitting such use or disclosure shall to that extent, supersede the provisions of this Agreement." *Id.*

---

[7] A redacted version of the NDA is available at ECF No. 25-3.

Both the PIA and NDA certainly address the parties' disclosure and use of proprietary information, but the NDA does not supersede the PIA for the claims alleged in the Complaint. First, Section 13 applies in limited circumstances where the PIA prohibits the use or disclosure of proprietary information but a subsequent contract "requires or permits use of" that information. In those circumstances, and only "to that extent," will the subsequent contract govern. Neither party asserts that the use of the disclosed information here was prohibited under the PIA but authorized under the NDA. Had that been so, *then* the NDA would supersede the PIA. But that is not the case. Second, the subject matter of the NDA is narrower than the PIA. As BAE points out, the NDA specifically "pertains only to the Proprietary Information that is *disclosed during the term of this Agreement*," i.e., for three years after February 14, 2022 "[u]nless otherwise extended or terminated." NDA §§ 5, 16 (emphasis added). The Complaint alleges that L3 breached the PIA because it improperly used information BAE disclosed in 2020 and 2021, pre-dating the parties' execution of the NDA. Compl. ¶¶ 51–54, 58–59. L3 fails to respond to this argument or explain why the information that BAE alleges L3 used in violation of the PIA would be covered by the NDA. Therefore, the Court cannot say that the NDA would supersede the PIA based on the allegations in the Complaint. The NDA is thus not integral to the Complaint and not proper to consider on the motion to dismiss. The motion to dismiss the claim for breach of the parties' obligations regarding proprietary information is denied.

### D. Quasi-Contract Claims

L3 argues that BAE's claims for unjust enrichment and promissory estoppel must fail because the parties' relationship is governed by a binding agreement. Def.'s MTD 15–17. If it is "undisputed" that the existence of an agreement and its scope "clearly covers the dispute between the parties," then New York law does not permit quasi-contract claims. *Clark-Fitzpatrick, Inc. v.*

*Long Island R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987).  However, when the existence of a binding

agreement covering the conduct that constitutes the breach is in dispute, the plaintiff may bring

quasi-contract claims in the alternative.  *See, e.g.*, *Nakamura v. Fujii*, 677 N.Y.S.2d 113, 116 (N.Y.

App. Div. 1st Dep't 1998) ("although the existence of a valid and enforceable contract generally

precludes quasi-contractual recovery, where, as here, a bona fide dispute exists as to the existence

of the contract, the plaintiff may proceed on both breach of contract and quasi-contract theories");

*Pers. Watercraft Prod. SARL v. Robinson*, No. 16-cv-9771, 2017 WL 4329790, at *11 (S.D.N.Y.

Sept. 1, 2017) (permitting a promissory estoppel claim to proceed despite plausibly alleging the

existence of an agreement because a plaintiff may "plead the alternative theories of promissory

estoppel and breach of contract when the defendant does not concede the enforceability of such

contract").  Although BAE has plausibly alleged the existence of an agreement, the Court has not

determined as a matter of law that such agreement binds L3 to award BAE the subcontract.  L3

also clearly disputes that conclusion.  As such, BAE's quasi-contract claims may proceed.

L3 next argues that BAE has not alleged the elements of unjust enrichment and *quantum*

*meruit*.  Under New York law, these claims "are analyzed together as a single quasi-contract

claim." *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 991 F.3d 361, 365 n.1 (2d Cir. 2021). To plead

a claim for *quantum meruit*, the plaintiff must allege "(1) the performance of services in good faith,

(2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of

compensation therefor, and (4) the reasonable value of the services." *Mid-Hudson Catskill Rural*

*Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005).  To plead a claim for

unjust enrichment, the plaintiff must allege "(1) that the defendant was enriched; (2) that the

enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity

and good conscience the defendant should return the money or property to the plaintiff." *Golden*

*Pac. Bancorp v. FDIC*, 273 F.3d 509, 519 (2d Cir. 2001).

L3 argues, more specifically, that BAE has not alleged L3 "was enriched, that it would be against equity and good conscience to deny BAE relief, or that there was an expectation of compensation." Def.'s MTD 18. The Complaint alleges that L3 was enriched when it was awarded, based in part on using BAE's proprietary information, a prime contract for $205 million and worth up to $593 million. Compl. ¶¶ 19, 27, 73–74. Using BAE's information and resources to obtain the contract was contingent on BAE being the exclusive subcontractor for its intended scope of work. *Id.* ¶¶ 46, 50. But L3 cut BAE out of the deal and did not provide any compensation for the time and resources spent helping L3 win the Contract and preparing to work on it. *Id.* ¶¶ 86, 109, 113. These allegations plausibly allege a claim for unjust enrichment and *quantum meruit.*

### E. Limitation of Liability

L3 argues that even if BAE has sufficiently alleged a claim for breach of contract, it must be dismissed because of the "Limitation of Liability" clause in Section 15 of the MOA. Def.'s MTD 12–15. Section 15 states:

> Except for claims based on a violation of the rights and obligations under Section 5 ["Proprietary Information and Technical Data"], in no event shall either Party be liable to the other, as a result of the performance of this Agreement, for any loss of profits; any direct, indirect, incidental, special, exemplary, or consequential damages; or any claims or demands brought against the other Party, even if the other Party has been advised of the possibility of such damages. This limitation of liability shall not apply to claims by third parties or liabilities resulting from the other Party's gross negligence, willful misconduct or fraud.

MOA § 15. L3 asserts Section 15 forecloses all of BAE's claims stemming from breach of contract because it precludes liability "as a result of the performance of this Agreement."

BAE advances a different reading of Section 15. It points to another provision in the MOA that it asserts addresses and permits recovery for breach of contract claims. Pl.'s Opp'n 8–9.

Specifically, Section 4, covering each party's "Financial Obligation," states:

> Each Party will bear its own respective costs, risks, and liabilities
> incurred by it as a result of its obligations and efforts under this
> Agreement, provided that any such costs, risks and liabilities are not
> the result of the other Party's breach of its obligations under this
> Agreement.   Therefore, neither Party shall have any right to
> reimbursement, payment, or compensation of any kind from the
> other Party during the period prior to the execution of any resulting
> contract issued by a lead Party to the secondary Party (as such roles
> may be defined for the work identified in an Annex).

MOA § 4.  BAE argues that Section 4 permits at least damages for reimbursement of "liabilities

incurred" as "the result of the other Party's breach of its obligations" of the MOA.  Thus, reading

Section 4 along with Section 15, BAE asserts that the limitation on liability forecloses recovery

for damages incurred "as a result of the performance" but not "breach."[8]

The Court concludes that, at this stage, the limitation of liability clause does not bar BAE's

claims because Sections 4 and 15 are ambiguous and susceptible to more than one reasonable

interpretation.  *See Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156

(2d Cir. 2016) ("At the motion to dismiss stage, a district court may dismiss a breach of contract

claim only if the terms of the contract are unambiguous.").   "Ambiguity in a contract is the

inadequacy of the wording to classify or characterize something that has potential significance."

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir.

2004).  The threshold question of whether a contract is ambiguous is a question of law.  *See Diesel

Props S.r.L. v. Greystone Business Credit II LLC,* 631 F.3d 42, 51 (2d Cir. 2011).  An ambiguity

---

[8] Separately, BAE contends that its claim for breach of the PIA is exempt from Section 15.  The
Court agrees, *see* MOA §§ 5.1, 15, and L3 does not dispute that conclusion, Def.'s Reply Mem.
Law Supp. Mot. Dismiss ("Def.'s Reply") 6–7, ECF No. 35.  BAE adds that its claim that L3
breached the covenant of good faith and fair dealing is excluded from the limitation of liability
clause too, because L3 acted with "willful misconduct."  Because the Court granted L3's motion
to dismiss that claim, the Court need not address whether the limitation of liability clause applies.

exists where the terms of a contract could suggest "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Eternity Global*, 375 F.3d at 178. "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). In addition, "it is a cardinal rule of contract construction that an agreement should be interpreted to give meaning and effect to each of its provisions." *Levine v. 860 W. Tower, Inc.*, No. 96-cv-6124, 1999 WL 185270, at *4 (S.D.N.Y. Mar. 31, 1999).

The key terms in Sections 4 and 15 suffer from ambiguity that cannot be resolved on the motion to dismiss. In context of the parties' agreement, it makes sense to view "breach" referenced in Section 4 as different from "liabilities" resulting from "performance" in Section 15, because the MOA envisions that the parties will execute other formal contracts within its framework. *See* MOA § 4. Thus, breach of the MOA itself could mean something different from harm that occurs because of the eventual performance of a specific government contract executed further to the MOA. But on the other hand, "performance" could encompass the failure to perform under the MOA itself, which is just another way of saying "breach." This interpretation likewise gives meaning to the portion of Section 4 that states "neither Party shall have any right to reimbursement, payment, or compensation of any kind," and renders the sentence more consistent with the limitation of liability clause. However, this reading fails to give effect to Section 4's exception for liability arising from "the other Party's breach of its obligations under this Agreement." Because the "contract is ambiguous as applied to a particular set of facts," the Court "has insufficient data

to dismiss" the Complaint. *Eternity Global*, 375 F.3d at 178.[9] BAE's contract claims therefore may proceed at this time despite the limitation of liability clause.

### III.    Misappropriation and Unfair Competition Claims

BAE alleges that L3 misappropriated its trade secrets and proprietary information in violation of the DTSA and New York common law and that its conduct constitutes unfair competition in violation of New York law. L3 moves to dismiss these claims.

### A.  Defend Trade Secrets Act

L3 argues that it is "entirely speculative" that it improperly used BAE's trade secrets in violation of the DTSA. Def.'s MTD 20. BAE responds that "[t]he only plausible explanation" on the facts alleged is that L3 used BAE's trade secrets as a shortcut to execute the SPEIR Contract without BAE and in violation of the parties' agreement. Pl.'s Opp'n 18–19.

To bring a DTSA claim, the plaintiff must allege that it owns a trade secret that was "misappropriated." *See* 18 U.S.C. § 1836(b)(1). "Misappropriation" means the "disclosure or use of a trade secret of another without express or implied consent by" someone who "at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret," or was "derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret." *Id.* § 1839(5). In other words, a defendant misappropriates a trade secret under the DTSA when it discloses or uses a trade secret without consent.

---

[9] L3 also argues that BAE's quasi-contract claims fail for several reasons, all based on Sections 4 and 15. *See* Def.'s MTD 14, 18–19. For example, L3 contends that Section 4 precludes the only form of damages (reliance damages) recoverable for quasi-contract claims. Because the relevant provisions of the MOA are ambiguous, the Court does not reach whether they apply to BAE's quasi-contract claims.

Although BAE cannot allege with certainty that L3 used its trade secrets to execute the SPEIR Contract on its own, Compl. ¶ 119, BAE has alleged facts supporting the inference that L3 improperly used BAE's trade secrets in violation of the DTSA. To start, if L3 used BAE's trade secrets without BAE on the SPEIR Contract, its use would be without consent. *See id.* ¶ 46. BAE also alleges that it provided L3 with detailed trade secret information—so detailed that it provided L3 with a roadmap for executing BAE's scope of work. For example, in one presentation that included trade secrets, BAE disclosed the components necessary "to achieve the responsiveness the Navy required of the SPEIR solution" with "specific suppliers for those components" and "how to assemble" them, leaving "L3 with a turnkey solution." *Id.* ¶¶ 53, 59, 61. Given that L3 had no prior knowledge or experience in BAE's scope of work and had not independently invested the time or resources to develop technology like BAE's, *id.* ¶¶ 28, 59–60, it would have been "impossible for L3 to have developed its own technical solution in just a few months, including a unique hardware and software configuration, without utilizing BAE Systems' trade secrets and proprietary data to shortcut the development process," *id.* ¶ 90. Yet L3 performed BAE's "scope of work itself." *Id.* ¶ 86. Consequently, the Complaint supports the inference that L3 used BAE's trade secrets without its consent to execute the SPEIR contract so quickly and without any prior experience or knowledge. *See, e.g., Medidata Sols., Inc., v. Veeva Sys. Inc.*, No. 17-cv-589, 2018 WL 6173349, at *4 (S.D.N.Y. Nov. 26, 2018) (sufficiently stating DTSA claim where plaintiff alleged defendant used "trade secrets to introduce competing products in record time despite [defendant's] lack of experience" and in contrast with plaintiff's investment in developing the knowledge); *see also Next Commc'ns, Inc. v. Viber Media, Inc.*, No. 14-cv-8190, 2016 WL 1275659, at *5 (S.D.N.Y. Mar. 30, 2016) ("At this stage, without discovery, it is to be expected that Plaintiffs would have limited knowledge of the extent to which Defendant has used their trade

secrets."). BAE has sufficiently stated a misappropriation claim under the DTSA.

## B. New York Tort Claims

L3 argues the misappropriation of trade secrets and unfair competition claims are duplicative of BAE's breach of contract claim. Def.'s MTD 21–23. Under New York law, a plaintiff cannot bring a tort claim where the allegations underlying it are "merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract." *Clark-Fitzpatrick*, 516 N.E.2d at 194. A tort claim goes beyond a breach of contract claim if the plaintiff also alleges the defendant violated an "independent duty in tort," such as the defendant "willfully intend[ing] to harm the plaintiff." *Cf. Carvel Corp. v. Noonan*, 350 F.3d 6, 16 (2d Cir. 2003).

According to the Complaint, L3 committed these torts when it improperly used information shared pursuant to the Teaming Agreement for its own economic benefit. *See, e.g.*, Compl. ¶ 139 ("L3's exploitation of BAE Systems' Trade Secrets and Proprietary Information for its own account, in violation of the PIA, constitutes bad faith" and states a claim for unfair competition); *id.* ¶ 128 ("L3 is using BAE Systems' Trade Secrets to perform the SPEIR Contract, without BAE Systems' involvement, in violation of the PIA" and states a claim for misappropriation of trade secrets); *see also* Pl.'s Opp'n 25. These claims fall squarely within the allegations underlying the breach of contract claim for breach of the PIA. Because "[t]he same circumstances that would give rise to a breach . . . would give rise to a tort for misappropriation of trade secrets [and unfair competition]," the claims are duplicative and must be dismissed. *Nostrum Pharms., LLC v. Dixit*, No. 13-cv-8718, 2016 WL 5806781, at *16 (S.D.N.Y. Sept. 23, 2016); *see also A Star Grp., Inc. v. Manitoba Hydro*, No. 13-cv-4501-PAC, 2014 WL 2933155, at *7 (S.D.N.Y. June 30, 2014) (holding that the misappropriation of trade secrets and unfair competition claims were duplicative

of the breach of contract claims), *aff'd*, 621 F. App'x 681 (2d Cir. 2015).

BAE's arguments to the contrary are unavailing. First, BAE asserts that it may bring these claims in the alternative because L3 disputes the enforceability of the Agreement. While courts have permitted alternative pleading where a contract's applicability is in dispute, *Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.*, No. 14-cv-9687, 2016 WL 4916969, at *10 (S.D.N.Y. Feb. 11, 2016) (collecting cases), L3 does not dispute that an enforceable agreement applies to the conduct concerning these tort claims, Def.'s Reply 10. Second, BAE maintains that these claims are not duplicative because L3 violated a duty independent of its obligations under the PIA when L3 willfully harmed BAE. Pl.'s Opp'n 23. But BAE does not allege any conduct supporting that L3 willfully intended to harm BAE. Indeed, BAE provides no citation to the Complaint for the assertion that L3 acted with "willful intent" or that "L3 strung BAE Systems along for more than a year." Pl.'s Opp'n 23. BAE's reliance on *Bytemark, Inc. v. Xerox Corp.* actually illustrates what is missing from the Complaint. 342 F. Supp. 3d 496 (S.D.N.Y. 2018). There, the plaintiff specifically alleged that "Defendants 'had no intention of partnering with Plaintiff'" but had the plaintiff "disclose its valuable intellectual property, trade secrets and other confidential information" under "the guise of forming a partnership with plaintiff." *Id.* at 507–08 (citing the Amended Complaint). Here, by contrast, there is no allegation that L3 did not intend on working with BAE on the SPEIR Contract. The Complaint supports the opposite inference: that L3 intended to work with BAE but the parties never reduced that intention to a formal, cohesive agreement. Besides, "simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim." *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001). Accordingly, the Court finds the misappropriation of

26

trade secrets and unfair competition claims should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** L3's motion to dismiss. L3's motion to dismiss the claims for breach of the duty of good faith and fair dealing (Count II), misappropriation of trade secrets (Count VI), and unfair competition (Count VII) is **GRANTED**. L3's motion to dismiss the breach of contract (Count I), unjust enrichment/*quantum meruit* (Count III), promissory estoppel (Count IV), and DTSA (Count V) claims is **DENIED**. The stay on discovery is lifted. L3 must answer the Complaint within 30 days from the date of this Opinion & Order. The Clerk of the Court is directed to close the motion at ECF No. 23.

The Initial Pretrial Conference is scheduled to go forward on: **Thursday, March 14, 2024 at 2:45 PM** via teleconference before Judge Paul A. Crotty, U.S.D.J. Dial-in: 888-363-4749. Access: 8539662. The submission of the proposed civil case management plan (can be found on the SDNY website) and joint letter, pursuant to Rule 6G of Judge Crotty's Individual Practices, due two business days prior to the conference. The joint letter should be filed on ECF in accordance with the ECF filing instructions as opposed to e-mailing the documents to the Court. The proposed civil case management plan should be filed on ECF as an "exhibit / proposed order" to the joint letter. If the date is not convenient, either party can e-mail three (3) mutually convenient dates to the Courtroom Deputy at: David_C_Gonzalez@nysd.uscourts.gov.

Dated: New York, New York
      February 9, 2024

SO ORDERED

_____
HONORABLE PAUL A. CROTTY
United States District Judge

27